IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MARK WILSON,

            Plaintiff,

v.                                      CIVIL ACTION NO. 2:12-cv-04657

SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.,

            Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Sedgwick Claims Management Services, Inc.'s ("Sedgwick") motion for summary judgment [ECF 28]. For the reasons that follow, the Court **DENIES** the motion [ECF 28].

I.    BACKGROUND

A.  *Factual Background*

Sedgwick is an Illinois corporation whose principal place of business is in Tennessee. (ECF 1 at 2 and 28-2 at 1.) Plaintiff, Mark Wilson, is a West Virginia citizen (ECF 1 at 2 and 1-2 at 1) who was employed as a Claims Examiner in Sedgwick's Charleston, West Virginia office (ECF 1-2 at 1 and 28-1 at 9).

Wilson began his at-will employment with Sedgwick in November 2007, (ECF 28-1 at 9 and 28-3 at 1) and was by all accounts a good employee, receiving a promotion (ECF 28-1 at 10), at least two salary increases and multiple bonuses (ECF 28-1 at 10-12), generally positive

1

performance evaluations (ECF 30-2 at 1-13), and additional work responsibilities (ECF 30-1 at 3).

Sometime in 2010, Wilson began to experience health problems. (ECF 28-1 at 19-21) Although he continued to work (ECF 28-1 at 21), he requested time off for various doctors' appointments, and these requests were never denied by his supervisor, Barbara Brown (ECF 28-1 at 12, 21-23).

By May 2011, however, Wilson's health had deteriorated and despite his prior efforts he had not received a diagnosis of his condition. (ECF 28-1 at 19-25.) On May 26, 2011, he informed Brown that he needed to leave work to find out exactly what was going on with him so that he could get it corrected.[1] (ECF 28-1 at 24-25.) Although Wilson did not specify how long he would need to leave work, he indicated that he intended to return, and Brown did not tell him that he could not take time off to find out what was wrong with him. (ECF 28-1 at 24-26 and 30-1 at 6.) This was the last full day that Wilson went to work at Sedgwick. (ECF 28-1 at 25-31 and 28-4 at 1.)

Thereafter, Sedgwick began communicating internally and directly with Wilson regarding Wilson's eligibility for: (1) leave under the Family and Medical Leave Act ("FMLA"); (2) short-term disability ("STD"); and (3) reasonable accommodation under the American with Disabilities Act as Amended ("ADA"). A timeline of pertinent communications follows.

On June 8, 2011, Brown sent an email with the subject line "RTW" to Regina Lawson, a Colleague Resources Manager for Sedgwick, asking "Do you have dates for C yarbough[2] and

---

[1] The parties agree that the last day that Wilson went to work at Sedgwick was May 26, 2011. (Dockets 29 at 2 and 30 at 12.)

[2] Yarbough was another Sedgwick employee. (Dockets 28-1 at 13-16 and 32-1 at 1-2.)

Mark Wilson." (ECF 30-5 at 1.) Lawson responded, as pertinent here, that "Yarbough is approved 5/23 – 7/04 but the notice does not indicate rtw date. I have not received a notice that Mark Wilson has filed a claim." (ECF 30-5 at 1.) The parties agree that "rtw" is shorthand for "return to work" and that these emails concerned Wilson's and Yarbough's return to work dates. (ECF 30 at 10 and 32 at 3-4.)

Also on June 8, 2011, Terry Estep, a Human Resources FMLA Specialist employed by Sedgwick, called and spoke with Wilson to notify him that his claim for FMLA leave had been opened and to provide basic instructions on the claims process. (ECF 28-7 at 3-4.) On this date, Estep also sent a letter to Wilson providing written instructions on his claim for FMLA leave and enclosing a certification form for his medical providers to complete and return. (ECF 28-7 at 4, 8-12.) The certification form included a line for the "[d]ate patient is able to return to normal daily activities." (ECF 28-7 at 11.) Wilson was instructed to return the materials to Sedgwick by June 22, 2011. (ECF 28-7 at 4.)

On June 9, 2011, Mindy Holt, a Human Resources Disability Specialist with Sedgwick, spoke with Wilson regarding his STD request. (ECF 28-7 at 32-33.) The same day, she also sent a letter to Wilson enclosing the forms he needed to sign and return to Sedgwick and providing instructions for submitting required medical documentation. (ECF 28-7 at 33.) This letter twice directed Wilson to "[c]ontact your Sedgwick CMS Disability Specialist when you know your return to work date and provide a written release from your treating provider prior to your actual return to work date." (ECF 28-7 at 38, 41 and 30-4 at 1, 4.)

Between June 9, 2011 and June 22, 2011, Sedgwick contacted Wilson's medical provider, but did not receive any records. (ECF 28-7 at 33.) On June 23, 2011, Sedgwick denied Wilson's claims for FMLA leave and STD. (ECF 28-7 at 33.) Holt, however, granted Wilson a

14-day grace period, giving him until July 7, 2011, to send his medical documentation. (ECF 28-7 at 34.) Holt also indicated to Wilson that Sedgwick needed to know his return to work date. (ECF 28-7 at 34.)

On June 23, 2011, Wilson called Sedgwick inquiring whether his medical records had been received. (ECF 30-3 at 2.) In this call he also stated that he had to see a new doctor because he was recently diagnosed with HIV. (ECF 30-3 at 2.) Thereafter, Sedgwick received some of Wilson's medical records. (ECF 28-7 at 34.)

On July 7, 2011, however, Holt denied Wilson's STD claim because the records Sedgwick had received were insufficient to grant that claim. (ECF 28-7 at 34.)

Also on July 7, 2011, Lawson sent Wilson a letter indicating that his leave under the FMLA and STD had been denied but requested additional information to determine "whether an accommodation of an extended leave under the [ADA] is appropriate in your situation . . . ." (ECF 30-6 at 3.) Enclosed with the letter was a Colleague Disability Accommodation Request form for Wilson to complete. (ECF 30-6 at 3-5.)

On July 8, 2011, Estep again called and spoke with Wilson and informed him that a stand-alone FMLA claim had been opened for him. (ECF 28-7 at 4, 62.) Estep further informed Wilson that Sedgwick still needed Wilson's return to work date to process the claim. (ECF 28-7 at 5.) On this date, Estep also sent to Wilson a letter requesting additional information to evaluate his FMLA claim. (ECF 28-7 at 5.) This letter stated that Wilson "must provide the following information no later than July 15, 2011, or your leave may be denied" and then listed "Need start and end date of the leave." (ECF 28-7 at 14-15.)

On July 15, 2011, Wilson returned the Colleague Disability Accommodation Request form concerning his eligibility for accommodation under the ADA. (ECF 30-6 at 1.) In

response to a question on the form asking Wilson to "[d]escribe the accommodation you are requesting," Wilson wrote: "leave for doctor appts/treatment coming in maybe an hour later than normal / working from home some."  (ECF 30-6 at 4.)

On July 15, 2011, Estep also extended the deadline for Wilson to provide a return to work date until July 18, 2011.  Wilson does not dispute that he never submitted a return to work date to Sedgwick.  Rather, he argues that he could not supply a return to work date because he did not know what it would be.  (ECF 30 at 3-4, 10.)  Wilson further argues that he provided medical updates and otherwise responded to requests for information.  (ECF 28-1 at 28 and 30 at 3-4.)

On July 19, 2011, Sedgwick denied Wilson's stand-alone FMLA claim, effective July 18, 2011, due to the absence of a return to work date.  (ECF 28-7 at 5.)

On July 22, 2011, Sedgwick terminated Wilson, effective July 18, 2011.  (ECF 28-4 at 1.) Sedgwick asserts that the information considered in making the decision to terminate Wilson was his failure to provide the medical certification for leave and his continued absence from work."[3] (ECF 28-7 at 22.)  There is no indication in the record as to whether Sedgwick formally denied Wilson's request for a reasonable accommodation under the ADA prior to his termination.  In any event, it is undisputed that Sedgwick did not grant such a request.

On December 6, 2011, Wilson was for the first time cleared by his doctor to return to work.  (ECF 30-1 at 1.)

B.  *Procedural Background*

On May 18, 2012, Wilson filed suit against Sedgwick in the Circuit Court of Kanawha County, West Virginia.  (ECF 1-2 at 1-3.)  The Complaint states a single cause of action alleging that Wilson was discharged from his employment with Sedgwick "based upon, in whole or in part, [his] disability and/or perceived disability, and/or [Sedgwick's] failure to accommodate

---

[3] As of July 18, 2011, Wilson had not worked for seven weeks.  (Docket 28-7 at 23.)

[his] disability, in violation of the West Virginia Human Rights Act . . . ." (ECF 1-2 at 2.) On August 23, 2012, Sedgwick removed the case to federal court on the basis of diversity jurisdiction. (ECF 1 at 1.) Wilson did not seek remand.

After discovery was completed (ECF 24 at 1), Sedgwick filed its motion for summary judgment. Sedgwick argues that Wilson was not terminated due to any disability but, rather, for a legitimate and non-discriminatory reason, namely, his prolonged absence from work and his failure to provide Sedgwick with the information it requested to process and evaluate his request for medical leave. (ECF 28 at 3-4.) Sedgwick also argues that it considered an accommodation for Wilson, but that no reasonable accommodation existed that would meet his needs. (ECF 28 at 5-6.) In response, Wilson contends that genuine disputes of material fact exist with respect to whether Sedgwick's reasons for terminating him were pre-textual[4] and whether a reasonable accommodation existed in the form of extended leave. Accordingly, Wilson argues, summary judgment is inappropriate. (ECF 30 at 10-11.)

## II. LEGAL STANDARD

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If factual issues exist that properly can be resolved only by a trier of fact because they may reasonably be resolved in favor of either party, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *see also Pulliam Inv. Co., Inc. v. Cameo Props*., 810 F.2d 1282, 1286 (4th Cir. 1987). Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Ky. Cent. Life Ins. Co*., 950 F.2d 931, 937

---

[4] Sedgwick replies that its reason was not pre-textual. (Docket 32 at 3-4.)

(4th Cir. 1991). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *See* Fed. R. Civ. P. 56(e). A court must neither resolve disputed facts nor weigh the evidence. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995). Nor may a court make determinations of credibility. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

The moving party bears the initial burden of showing that there is no genuine issue of material fact, and that he is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23. "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick Cty Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991). When determining whether there is an issue for trial, the Court must view all evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123 (4th Cir. 1990). The non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

### III. DISCUSSION

The Court agrees with the parties that, although Wilson's complaint asserts a single cause of action under the West Virginia Human Rights Act, W. Va. Code, § 5-11-9, ("WVHRA"), Wilson actually states two claims: (1) that he was wrongfully discharged because of his disability, and (2) that Sedgwick breached its duty to afford him a reasonable accommodation for

7

his disability. (ECF 29 at 7-8; ECF 30 at 5, 7.) The Court considers each of Wilson's claims in turn.

A. *Wrongful Discharge*

The WVHRA provides, in pertinent part, that it is unlawful "[f]or any employer to discriminate against an individual with respect to . . . tenure . . . if the individual is able and competent to perform the services required even if such individual is . . . disabled." W. Va. Code § 5-11-9(1). To "discriminate" means "to exclude from, or fail or refuse to extend to, a person equal opportunities because of . . . disability . . . ." W. Va. Code § 5-11-3(h).

The West Virginia Supreme Court of Appeals has held that under the WVHRA a claim of employment discrimination is governed by a three-step evidentiary framework:

> In an action to redress unlawful discriminatory practices in employment . . . under the [WVHRA] . . . the burden is upon the complainant to prove by a preponderance of the evidence a prima facie case of discrimination . . . . If the complainant is successful in creating this rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

Syl. Pt. 3, in part, *Shepherdstown Volunteer Fire Dep't. v. State ex rel. State of West Virginia Human Rights Comm'n,* 172 W.Va. 627, 309 S.E.2d 342 (1983); *see also* Syl. Pt. 2, *Morris Memorial Convalescent Nursing Home, Inc. v. West Virginia Human Rights Comm'n*, 189 W.Va. 314, 318, 431 S.E.2d 353, 357 (1993) (articulating requirements needed to establish a case of discriminatory discharge for a disabled person); *Garvin v. World Color Printing (USA) II Corp.,* 3:10-cv-74, 2011 WL 1485998 at *11 (N.D. W. Va. April 19, 2011) (applying burden-shifting

framework to a claim under the WVHRA of wrongful termination based on a disability) (Bailey, J.).

In Syllabus Point 3 of *Hosaflook v. Consolidation Coal Co.*, 201 W.Va. 325, 329-30, 497 S.E.2d 174, 178-79 (1997), the West Virginia Supreme Court of Appeals articulated the requirements for establishing a prima facie case of disability discrimination under the WVHRA:

> "In order to establish a case of discriminatory discharge under [the WVHRA] with regard to employment because of a [disability][5], the complainant must prove as a prima facie case that (1) he or she meets the definition of [disabled], (2) he or she is a 'qualified [disabled] person,' and (3) he or she was discharged from his or her job."[6]

A person who is disabled under the WVHRA is a person who has "one or more physical or mental impairments that substantially limits one or more major life activities . . . ." Syl. Pt. 3 *Stone v. St. Joseph's Hosp.*, 208 W.Va 91, 102, 538 S.E.2d 389, 400 (2000). "The term 'major life activities' includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." W. Va. Code § 5-11-3(m)(1). A

---

[5] The Court uses the word "disabled" instead of "handicapped" because W. Va. Code § 5-11-9 was amended in 1998 to substitute the word "disabled" for "handicapped." *W. Va. Univ. / Ruby Mem'l Hosp. v. W. Va. Human Rights Comm'n ex rel. Prince*, 217 W.Va. 174, 617 S.E.2d 524, 527 n.3 (2005).

[6] The Court observes that the parties have proposed a different framework for establishing a prima facie case of wrongful termination on the basis of disability under the WVHRA. Under that framework, a plaintiff must prove that: (1) he is a member of a protected class, (2) the employer made an adverse decision concerning [him], and (3) but for [his] protected status the adverse decision would not have been made. (ECF 29 at 7 and 30 at 8.) *See* Syl. Pt. 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 166, 358 S.E.2d 423, 425 (1986). Those cases upon which the parties principally rely, however, do not concern claims of disability discrimination under the WVHRA. *See Young v. Bellofram Corp.*, 227 W.Va. 53, 59-61, 705 S.E.2d 560, 566-68 (2010) (age and gender discrimination), *Conaway*, 178 W.Va. at 167-70, 358 S.E.2d at 426-429 (age discrimination). Rather, in the context of claims that an employee was terminated as a result of his or her disability in violation of the WVHRA, the Supreme Court of Appeals of West Virginia has applied the above-described framework for evaluating a plaintiff's prima facie case. *See Hosaflook*, S.E.2d at 178-79. Numerous West Virginia federal courts, including this one, have also applied this prima facie framework to claims under the WVHRA of wrongful discharge on the basis of disability. *See, e.g.*, *Kitchen v. Summers Continuous Care Center, LLC*, 552 F. Supp. 2d 589, 593 (S.D. W. Va. May 12, 2008) (Johnston, J.); *Howell v. Bluefield Regional Medical Center, Inc.*, 3:09-cv-0287, 2008 WL 1176447 at *3-4 (S.D. W. Va. June 3, 2008); *Ruckel v. Sears, Roebuck and Co.*, 287 F. Supp. 2d 652, 655 (S.D. W. Va. Oct. 20, 2003).

person with HIV is a person with a disability within the meaning of the WVHRA. Syl. Pt., *Benjamin R. v. Orkin Exterminating Co., Inc.*, 182 W.Va. 615, 620, 390 S.E.2d 814, 819 (1990).

Additionally, "[a] 'qualified disabled person' who is protected by [the WVHRA] includes a person who has a disability and is temporarily unable to perform the requirements of the person's job due to their disability, with or without accommodation." Syl. Pt. 3, *Haynes v. Rhone-Poulenc, Inc.*, 206 W.Va. 18, 31, 521 S.E.2d 331, 344 (1999).

Here, Wilson has established genuine issues of material fact as to his prima facie case. First, according to Wilson's deposition testimony, in May 2011 he was "sick and on a decline," (ECF 30-1 at 6) and, thereafter, he was "getting more sick every day," with "more intense vision problems and just more fatigued." (ECF 28-1 at 29) Later, on June 13, 2011, he was diagnosed with HIV (ECF 30-1 at 6) and notified Sedgwick of that diagnosis on June 23, 2011 (ECF 30-3 at 2) . Second, as discussed in greater detail in Part III.B below, Wilson has presented an issue of material fact as to whether his inability to work was only temporary and whether, with accommodation in the form of a leave of absence, he could have performed the requirements of his job. Indeed, he was eventually cleared to work by his doctors approximately six months after his HIV diagnosis. With respect to the third element of his prima facie case it is undisputed that Wilson was terminated from his job.

Sedgwick argues that Wilson was not terminated due to his disability, but, rather, for a legitimate and non-discriminatory reason, i.e., his prolonged absence from work and his failure to provide Sedgwick with the information it requested to process and evaluate his request for medical leave, specifically a return to work date.[7] (ECF 28 at 3-4.)

---

[7] In support of its contention, Sedgwick argues that under 29 C.F.R. §§ 825.123(b)-(c), 825.306(e) an employer may require information regarding the likely duration of the condition rendering the employee unable to perform essential work functions and that failure to provide such information may result in the denial of FMLA leave. (ECF 28 at 4 and 29 at 11-12.) The Court does not have occasion to reach the substance of this argument, however,

10

In response, Wilson contends that Sedgwick's reason was pre-textual, pointing to the email communication between Brown and Lawson in which Lawson indicated that "Yarbough is approved 5/23 – 7/04 but the notice does not indicate [a return to work] date." Wilson argues that this email shows that, although he and Yarbough both failed to provide Sedgwick with a return to work date, he was denied leave and subsequently terminated for that reason. (ECF 30 at 10.) Sedgwick replies that its reason for terminating Wilson was not a pretext (ECF 32 at 3-4) and offers a second affidavit from Holt, who also managed Yarbough's FMLA and disability claims, to rebut Wilson's charge (ECF 32-1 at 1-2). In this affidavit, Holts states that Yarbough's claim was "due to a scheduled surgical procedure, for which there is a standard anticipated recovery time of six weeks" and that "Yarbough's medical providers notified Sedgwick on May 26, 2011[,] that [she] would be unable to work for approximately six weeks." (ECF 32-1 at 1-2.)

The Court agrees with Wilson, however, that this record presents a classic dispute of material fact. A reasonable fact finder could infer from Lawson's email that Wilson and Yarbough were, in fact, treated differently notwithstanding their respective failures to timely provide return to work dates, or could credit Holt's assertion that sufficient information about Yarbough's return to work date was provided. The credibility determinations and ultimate factual conclusions required to resolve such conflicting evidence are better suited to resolution by the fact finder, rather than by the Court through summary judgment. Accordingly, Sedgwick is not entitled to judgment as a matter of law on Wilson's wrongful discharge claim.

---

because even assuming that Sedgwick's policy of denying medical leave when an employee fails to provide a return to work date is entirely consistent with the pertinent federal regulations, Wilson has still demonstrated a genuine issue of material fact as to whether Sedgwick's decision to terminate Wilson on this basis was nonetheless pretextual.

B. *Reasonable Accommodation*

The West Virginia Supreme Court of Appeals has also "inferred that [the WVHRA] imposes [a] duty of reasonable accommodation," and that, therefore, "employers have an affirmative obligation to provide reasonable accommodation for disabled individuals." *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 63-64, 479 S.E.2d 561, 573-74 (1996). To state a claim for failure to accommodate, a plaintiff must prove the following elements:

> (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

Syl. Pt. 2, *Skaggs,* 479 S.E.2d at 568, 575. An employer may defend against a claim of reasonable accommodation by disputing any of the essential elements of the employee's claim. Syl. Pt. 3, *Skaggs*, 479 S.E.2d at 569, 576.

Here, Sedgwick only disputes whether Wilson requested extended leave under the ADA, and, if he did, whether such a request was a reasonable accommodation. (ECF 28 at 5 and 29 at 13-14.)

With respect to Sedgwick's first contention, Wilson responds by pointing to the Colleague Disability Accommodation Request form that he completed. (ECF 30 at 4.) This form asked Wilson, among other questions, to "[d]escribe the accommodation you are requesting," to which Wilson wrote: "leave for doctor appts/treatment coming in maybe an hour later than normal / working from home some." (ECF 30-6 at 4.) Wilson's request could reasonably be read as a request for extended leave, coupled with certain other accommodations to take effect upon his return from that leave. This is particularly true in light of the fact that

Sedgwick's letter to Wilson enclosing the form explicitly contemplates Wilson's eligibility for "an accommodation of an extended leave under [the ADA]." (ECF 30-6 at 3.) Moreover, at the time that Wilson completed and returned this form he had been absent from work for approximately seven weeks since he told Brown on May 26, 2011, that he needed to leave work to find out exactly what was going on with him, (ECF 28-1 at 24-25 and 30-6 at 1, 5) and during this time Sedgwick's employees had communicated internally and with Wilson about issues related to his absence and his medical condition, including his HIV diagnosis (ECF 28-7 and 30-3 at 1-3 and 30-5 at 1, 6, 12). Accordingly, the Court finds that an issue of fact exists as to whether Wilson requested extended leave.

The question thus becomes whether Wilson's request for leave was a reasonable accommodation. In Syllabus Point 4 of *Haynes v. Rhone-Poulenc, Inc.*, 206 W.Va. 18, 31, 521 S.E.2d 331, 344 (1999), the West Virginia Supreme Court of Appeals held that under the WVHRA a "required reasonable accommodation may include a temporary leave of absence that does not impose an undue hardship upon an employer, for the purpose of recovery from or improvement of the disabling condition that gives rise to an employee's temporary inability to perform the requirements of his or her job." The Court further explained that, in the context of the case before it, by "disabling condition" it referred to "a totally disabling medical condition of limited duration, so that following a temporary leave of absence for treatment and improvement, it is reasonably foreseeable that the plaintiff is likely to return to work." *Id.* at 344 n.17.

Sedgwick argues that Wilson's return to work was not reasonably foreseeable because Wilson had not provided it with a return to work date and that, as confirmed by Wilson's subsequent deposition testimony, neither Wilson nor his doctor knew at that time how long it would be before he could return to work. (ECF 28 at 6 and 28-1 at 7-8 and 29 at 15.) Wilson

13

responds that at the time of his request Sedgwick knew of his condition (ECF 30-3 at 2) and that it is well-known that with appropriate treatment individuals with HIV can carry on their normal activities of daily living, including employment (ECF 30 at 12-13). Wilson further points out that Sedgwick's policies contemplate leave as an accommodation for conditions covered by the ADA, (ECF 30 at 11 and 30-7 at 3 and 30-8 at 3) and that Sedgwick employees (1) determined that Wilson's condition fell under the ADA (ECF 30-5 at 6), (2) conducted research with respect to a possible accommodation for him based on that condition (ECF 30-5 at 6), and (3) observed specifically with respect to his situation that the need for a leave of absence can be considered an accommodation (ECF 30-5 at 12).

The Court agrees that whether Wilson's request was reasonable is an issue of fact best resolved by the jury. In addition to those assertions advanced by Wilson, the Court observes that neither the July 7, 2011, letter to Wilson nor the Colleague Disability Accommodation Request form indicate that a specific end date of leave period was required for Sedgwick to grant an accommodation of extended leave. (ECF 30-6 at 3-5.) Moreover, the Court cannot conclude that it is per se unreasonable to attribute to Sedgwick some knowledge of the potential duration of Wilson's requested absence based on its knowledge of his condition. Indeed, in responding to Wilson's claims of pretext Sedgwick relies in part on the fact that Yarbough's claim was "due to a scheduled surgical procedure, for which there is a standard anticipated recovery time of six weeks." (ECF 32-1 at 2.)

Accordingly, because issues of fact exist as to whether an extended leave would have been a reasonable accommodation for Wilson, Sedgwick is not entitled to summary judgment on Wilson's failure to accommodate claim.

## IV. CONCLUSION

Accordingly, the Court **DENIES** Sedgwick's motion for summary judgment [ECF 28].

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record.

ENTER: November 19, 2013

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE